IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| ENRIQUE MORENO IV | § | |
| VS. | § | CIVIL ACTION NO. 1:19cv156 |
| UNITED STATES OF AMERICA | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Enrique Moreno IV, as administrator of the Estate of Moreno III, proceeding *pro se*, brings this lawsuit pursuant to the Federal Torts Claims Act, 28 U.S.C. § 2671, *et. seq.* (the "FTCA"), against the United States of America.

The defendant has filed a motion to dismiss (doc. no. 5). Plaintiff has filed a reply to the motion. The motion is therefore ripe for consideration.

<u>Factual Allegations</u>

Plaintiff alleges that on November 16, 2011, Enrique Moreno III was seen at Texas Oncology where he tested positive for the Hepatitis C virus ("HCV"). However, the Bureau of Prisons ("BOP") did not make note of this diagnosis until an administrative note dated October 8, 2012.

Plaintiff states HCV is an infection spread through contaminated blood that causes liver inflamation which can lead to serious liver damage. He states chronic HCV is usually curable with oral medications taken every day for two to six months. Chronic HCV becomes apparent in symptoms that may include fluid build up in the abdomen, leg swelling, weight loss, confusion/drowsiness/slurred speech, spider angiomas, itchy skin, dark-colored urine, poor appetite, fatigue, and easy bruising and bleeding.

Plaintiff alleges Mr. Moreno underwent serology testing on September 20, 2012, which again showed he was positive for the HCV antibody, specifically Type IB. On July 5, 2013, he was seen at Baptist Beaumont Hospital for an abdomen ultrasound, where it was noted he was suffering from liver disease and HCV.

Plaintiff states that as part of its evaluation and management of HCV infections amongst the inmate population, the BOP assigns each HCV patient with an aspartate aminotransferase to platelet ratio index ("APRI") score. In June, 2014, the BOP issued guidance stating that HCV infection should be prioritized for treatment in scenarios involving advanced hepatic fibrosis/cirrhosis. According to these guidelines, in determining the degree of fibrosis, inmates should be prioritized for treatment if they have an APRI score greater than or equal to 1.0 or if their APRI score is between 0.7 and 1.0 and there are other findings suggestive of advanced fibrosis. While a liver biopsy was not required, results of a prior liver biopsy could be used to meet the advanced fibrosis criteria.

In July, 2015, additional guidelines were issued stating that while all patients with chronic HCV infection could benefit from treatment, certain cases were at higher risk for complications or disease progression and therefore required more urgent consideration for treatment. These guidelines state that cases of known cirrhosis or clinical findings consistent with cirrhosis constituted Priority Level 1, the highest priority for treatment. The guidelines stated that if a person was known to have cirrhosis, the APRI score was irrelevant and unnecessary.

In October, 2016, the BOP issued guidelines providing that inmates were to be placed in Priority Level 1 if they had an APRI greater than or equal to 2.0, a Meavir or Batts/Ludwig stage 3 or 4 liver biopsy, or known or suspected cirrhosis. Similar guidance was issued in May, 2017, and January, 2018.

Plaintiff alleges that at the very latest Mr. Moreno qualified for Priority Level 1 treatment by June, 2014, as he had been diagnosed with liver disease as recently as July 3, 2013.

Plaintiff alleges that on February 9, 2014, Mr. Moreno sent a message to BOP chronic care nurse Brandi Whittington, a licenced vocational nurse, inquiring about his specific genotype and treatment options while incarcerated. The following day, Ms. Whittington responded by stating Mr. Moreno was Genotype I and that he would be put on the schedule to discuss possible HCV treatments. However, Ms. Whittington never discussed and/or presented treatment options to Mr. Moreno.

On July 14, 2014, Mr. Moreno reported to Health Services where he was seen by L. Lackey, a registered nurse. Mr. Moreno complained of a large and unexplained bump on the left side of his abdomen. Nurse Lackey noted Mr. Moreno's small and narrow stools, the growing lump and associated pain, and his HCV history. Mr. Moreno was told he would be scheduled to see a provider for further evaluation.

Plaintiff states Mr. Moreno reported to sick call on July 28, where he complained to Nurse Lackey and Lance Watson, another registered nurse, that he was worried about painful swelling on the left side of his abdomen and HCV. Nurse Watson noted that Mr. Moreno's abdomen appeared swollen and noted his MCV diagnosis. It was noted that Mr. Moreno would be seen by a provider on July 31.

On July 31, Nurse Practitioner S. Henderson noted that Mr. Moreno complained of a left abdominal protrusion. NP Henderson observed Mr. Moreno's history of cirrhosis and noted that radiology of the abdomen was ordered for August 8.

That same date, Mr. Moreno sent Ms. Whittington a message requesting his APRI scores. Ms. Whittington responded that Mr. Moreno's APRI score was 0.785 on May 6, 2014, and that APRI scores were recalculated annually. Plaintiff asserts that according to the June, 2014, Guidelines, Mr. Moreno should have already qualified for Priority Level 1 treatment as he was known to have liver disease and cirrhosis.

On August 14, Mr. Moreno's abdomen was x-rayed. The findings of Dr. Sandeep Amesur showed air in the gastrointestinal tract, but not gross evidence of obstruction or free air. Dr. Amesur's report noted a 7 mm calcification over the left renal shadow and that left renal calculus would need consideration.

On September 5, Mr. Moreno sent Ms. Whittington a message seeking his 2013 APRI score. She responded stating his 2013 score was 1.779, but that his 2014 score was substantially and unexplainably lower at 0.785.

On September 14, Mr. Moreno wrote Ms. Whittington seeking information about new HCV treatments as well as BOP's treatment plan for him. He asked to be placed on the HCV waiting list for treatment. Ms. Whittington told him that as of 2011, there were at least four new treatments available for HCV. However, according to her interpretation of the guidelines, BOP would prioritize treatment for inmates with an APRI score above 1.0 with advanced hepatic fibrosis/cirrhosis. She stated Mr. Moreno did not meet this criteria because his APRI score on May 4, 2014 was 0.785.

On October 20, Mr. Moreno sent a message to Health Services Administrator Emily Sonier, requesting attention from a doctor to determine to the cause of a grapefruit-sized lump on the left side of his abdomen. He said he was experiencing pain from the lump, which was growing, narrow and flat stools, and nerve-wracking anxiety over the potential cause of the lump. He stated that even though he had consistently requested medical attention, Health Services told him he should buy aspirin at the commissary and that he would be scheduled to see a doctor. However, this hadn't happened. On October 16, Ms. Sonier responded, stating he was scheduled to see a doctor the next week and that he should watch call outs.

On October 27, Dr. Issam Hamoush noted Mr. Moreno had a significant bulge on his left flank as compared with the right side. Dr. Hamoush asked that Mr. Moreno be seen by Gastroenterology for left abdomen distension, with narrow caliber stools tinged with blood. On October 31, Dr. Harmoush recommended that Mr. Moreno undergo a colonoscopy.

On November 1, Mr. Moreno was seen by Dr. Bean, a gastroenterologist, who also recommended a colonoscopy. A nurse noted this in a clinical encounter administrative note.

On November 3, in response to an order from Dr. Harmoush, Mr. Moreno underwent a complete blood count test. This showed a low red blood count, high monocyte percentage, high ALT, high AST and a high protein count.

On December 15, Mr. Moreno reported to Health Services complaining of widespread pain centered upon a large growth/hernia on the left side of his abdomen. Nurse Lackey noted Mr. Moreno had numerous CCC issues and that he would be scheduled to see a provider.

On December 21, Mr. Moreno sent Ms. Sonier a message stating he was scheduled to be seen by a provider, but did not know when this would occur. He complained that his abdominal growth/hernia continued to increase in size and caused him issues with movement. Ms. Sonier responded by saying Mr. Moreno was already scheduled to see a provider and should watch the call out.

Dr. Sreedhar Polaurapu ordered that Mr. Moreno be seen by Dr. William Romani, a radiologist. Dr. Romani noted Mr. Moreno's history of hepatitis C and lower left quadrant mass. His findings stated the liver was prominent in size, demonstrating a macrolobulated contour secondary to long-standing cirrhosis with enlarged caudate lobe, macrolobulated surface contour and heterogenous enhancement. He stated the findings were in keeping with the documented history of cirrhosis.

On May 17, 2015, after he received a copy of the radiology report, Mr. Moreno sent a message to Ms. Sonier stating the radiology report said nothing and offered no diagnosis regarding the mass on his abdomen. He complained that Dr. Polaurapu needed to call Dr. Romani to ask why that information was absent from the report. Ms. Sonier responded by stating Mr. Moreno had been scheduled to see a mid-level practitioner, but that the appointment could take 30-45 days. Mr. Moreno responded on May 21 by stating he did not need to see a mid-level practitioner, but needed to see a doctor and receive a diagnosis. Ms. Sonier again told him he had been scheduled to see a mid-level practitioner.

Mr. Moreno reported to sick call on June 12 and was told his appointment had been cancelled and rescheduled for the next day. The appointment was cancelled the next day as well. On June 13, Mr. Moreno informed Ms. Sonier of the cancellations and his need for treatment.

Mr. Moreno filed a sick call form setting forth his complaints, noting his HCV diagnosis and asking to see a doctor. On June 27, Ms. Sonier responded stating he was scheduled to be seen by a doctor.

On June 28, Mr. Moreno wrote Ms. Sonier again, seeking treatment and asking for the renal calculus recommended by Dr. Henderson. He also sought a transfer to Fort Worth for further treatment. He wrote again on July 8, asking to be informed in writing of the medical requirements for HCV treatments, his APRI scores and information regarding when he could begin treatment. On July 27, Ms. Sonier responded by stating his request had been sent to the CID nurse and that he should give her time to conduct research. On September 16, she informed Mr. Moreno he had been scheduled to see a doctor.

On December 15. Mr. Moreno wrote Ms. Whittington asking for his APRI scores and his status regrading HCV treatment. He also asked her whether he qualified for treatment. She responded by stating she was only working on cases with APRI scores from 4.00 to 3.00

On January 12, 2016, Mr. Moreno sent Ms. Whittington a message asking whether his cirrhosis diagnosis affected his APRI score and/or his eligibility for more urgent consideration for treatment of Hepatitis C. She stated that in accordance with the 2015 guidelines, priority treatment was based on APRI scores, with higher scores resulting in a higher priority. She stated Mr. Moreno's score was 0.92, in the low range. Plaintiff asserts that according to the guidelines in effect at that point, the APRI score should have been irrelevant if the person had cirrhosis.

On April 6, Mr. Moreno was seen by Dr. Carlos Morales. Dr. Morales noted Mr. Moreno's colonoscopy appeared normal, but that he had an abnormal activity on the left lateral aspect of his abdomen and an apparent hernia that was tender. He recommended that Mr. Moreno be retested for a colonic neoplastic mass with a colonoscopy and if that were negative that the umbilical hernia be repaired laparoscopically. Dr. Morales indicated Mr. Moreno had a history of HCV, abdominal pain and that his father had died of liver disease at age 62.

Mr. Moreno wrote Ms. Sonier on April 24 requesting follow-up treatment and information regarding his appointment with Dr. Morales. He asked what treatment would be provided. On April 29, Mr. Moreno was informed that referrals had been made for hernia repair and a colonoscopy.

On June 4, Mr. Moreno wrote Ms. Sonier stating he was having discomfort with the hernia/swelling on the left side of his abdomen, which was growing. Later that day, Ms. Phillips told him to report to sick call to be evaluated by a provider.

Correctional Counselor Taylor Smith, who received an informal resolution attempt ("IRA") from Mr. Moreno, noted that the IRA had been forward to Health Services for a response but that no response was forthcoming after several attempts.

On September 2, Mr. Moreno wrote Ms. Sonier stating he was scheduled to see an outside physician, but that the appointment was deferred on August 8. Mr. Moreno continued to ask to be seen by a doctor and stated that he was in pain. Ms. Phillips informed him the appointment had been deferred by the Regional Clinical Director, but provide no additional information.

Mr. Moreno wrote Ms. Whittington on September 16 saying he felt very weak and had no energy. He asked what vitamins he could take that would not do damage to his chronic conditions. Ms. Whitting told him vitamins were not normally recommended for someone with his diagnosis, but that he could ask the doctor about it at his next chronic care visit.

On September 19, Mr. Moreno wrote Warden Rachel Chapa, stating the medical staff was being deliberately indifferent to his serious medical needs. He described the growth on his abdomen and asked Warden Chapa to intercede with medical personnel on his behalf. Warden Chapa's response included a statement that the Regional Clinical Director had denied the referral for a colonoscopy and hernia repair because the recommendations were not clinically warranted or justified at the time.

Mr. Moreno appealed Warden Chapa's response on October 19. Regional Director J.A. Keller denied the appeal. He stated League Medical Concepts ("LMC") provided services for the BOP through a comprehensive managed care contract and that the LMC Regional Clinical Director was under no obligation to follow a consultant's recommendation.

On February 7, 2017, Mr. Moreno was seen at Beaumont MRI where his radiology testing showed cirrhosis of the liver and HCV. On February 15, blood work showed a low platelet level,

low creatinine, very high high AST (SGOT) and ALT (SGPT). A report dated February 22 stated Mr. Moreno's HCV Quantitation was 71,4000 IU/mL and handwriting on the document stated his APRI score was 2.28.

Between February and March, Mr. Moreno's cellmate and other inmates notified his family that they were very concerned about his deteriorating medical condition.

On March 17, Mr. Moreno was transferred from FCI Beaumont Low to Harris Health Ben Taub Hospital in Houston, Texas. Mr. Moreno died there on March 28, 2017, less than a month prior to his release date.

Warden Chapa informed Mr. Moreno's family that his cause of death was pulmonary cardiovascular collapse. However, plaintiff states the autopsy report from the Harris County Medical Examiner stated Mr. Moreno died from complications of HCV.

Plaintiff alleges that government employees at FCI Beaumont Low, including Ms. Whittington and Ms. Sonier, were negligent in ignoring Mr. Moreno's repeated requests for medical assistance, failing to schedule medical visits, failing to diagnose his condition, failing to obtain timely medical care and failing to treat his medical conditions. In so doing, plaintiff asserts the employees violated BOP guidelines for treatment they were supposed to implement and follow.

The Motion to Dismiss

The defendant seeks dismissal of this lawsuit based upon several reasons. One basis for dismissal cited was lack of subject-matter jurisdiction. The defendant asserts that the waiver of sovereign immunity contained in the FTCA does not apply to acts or omissions of persons who are independent contractors as opposed to employees of the government. The defendant states Ms. Whittington and Ms. Sonier are employed by LMC, which entered into a contract to provide medical care for inmates confined within the BOP, and are therefore independent contractors. As a result, the defendant argues it has not waived sovereign immunity with respect to acts or omissions of these individuals.

Attached to the motion to dismiss is a declaration from Dawn Payne, a Supervisory Contract Specialist at the Federal Correctional Complex in Beaumont, Texas ("FCC-Beaumont"). Ms. Payne states, in part, as follows:

> As part of my official duties, I am responsible for the procurement of property at FCC-Beaumont. Furthermore, I monitor a contract between the BOP and League Medical Concepts, LLC (LMC). Therefore I have personal knowledge of the contract and the nature of the relationship between LMC and the BOP. LMC's presence at FCC-Beaumont is strictly to provide medical care. True and correct copies of the relevant portions of the contract are attached as Attachments 1-5 to this declaration.
>
> An indefinite-delivery requirement contract was awarded to LMC on August 1, 2013. The underlying nature of this contract requires LMC to provide all necessary health services at FCC-Beaumont, and coordinate and manage inmate inpatient/outpatient care in the community as necessary. That contract had a base year and four option years. The complaint states, "By June 2014, at very latest, Moreno qualified for Priority Level 1 treatment of his HCV condition." Further, all specific dates of treatment are in 2014 or later in the complaint. The contract between LMC and the BOP was in its base year in June 2014, and it continued through July 31, 2014. The first option year as executed on July 23, 2014, and ran from August 1, 2014 to July 31, 2015. The second option year was executed on July 21, 2015, which ran from August 1, 2015, to July 31, 2016. The third option year was exercised on July 12, 2016, and ran from August 1, 2016 to July 31, 2017. Under the terms of the contract, the BOP is obligated to pay LMC a flat rate per day, per FCC-Beaumont inmate. The rate of the contract is calculated using a man-day rate (price per inmate, per day, based on the actual inmate count at FCC-Beaumont). The BOP does not provide to LMC employees traditional benefits often associated with an employment relationship. For instance, the BOP does not extend health benefits or retirement benefits to LMC employees. Nor does BOP extend sick or annual vacation to members of LMC staff. LMC employees are paid by LMC, and LMC is also responsible for withholding all applicable taxes.
>
> In exchange for payment, LMC provides all medical, psychiatric, and dental services to all FCC-Beaumont inmates who require such services, and makes all decisions concerning appropriate care for all such inmates. LMC provides comprehensive management, oversight, planning, equipment, maintenance, and repair programs. The BOP does not consider LMC or any of its agents, employees, or subcontractors to be employees of the BOP or any other agency of the United States Government. Results to be obtained are within the Contractor's own unsupervised determination, and neither the BOP nor any of its agents or employees supervise any agents, employees or subcontractors of LMC. Under the contract there is a provision which specifically states:
>
>> Non-Personal Service Status. Award of this contract will result in a contractual appointment only and shall not be construed as a personnel appointment with the BOP . . . . Payments to the Contractor shall based on the provision of an end product or the accomplishment of a specific task. Results to be obtained are within the contractor's own unsupervised determination. The Contractor

9

will not be subject to Government supervision but its efforts will be monitored for quality assurance.

Pursuant to FAR 37.401, the resulting contract shall be a nonpersonal health care services contract, under which the Contractor is an independent contractor. The Government may evaluate the quality of professional and administrative services provided, but retains no control over the medical, professional aspects of services rendered (e.g., professional judgments, diagnosis for specific medical treatment).

Under the contract, LMC is mandated to provide the same level of care available in current BOP institutions. LMC is also expected to "furnish all inmates, who have legitimate medical need, necessary devices and supplies (e.g., eyeglasses, hearing aids, special shoes, canes, etc.)." Because medical, psychiatric, and dental care require a high degree of education and skill, LMC is required to ensure that its employees have primary source verified credentials (i.e., professional education, residency, licensure, etc.).

The BOP does not dictate the manner by which LMC provides the appropriate level and quality of services and care so long as LMC complies with comprehensive staffing plans and operational procedures it submitted to the BOP in order to successfully obtain the contract. Determinations regarding the nature and extent of care to be provided to FCC-Beaumont inmates are left to the clinical judgment of LMC's health care professionals. The BOP does not retain control over the medical, professional aspects of services rendered (e.g., professional judgments, diagnosis for specific medical treatment.

The BOP initially provided the medical equipment necessary for LMC to provide medical services to FCC-Beaumont inmates. LMC is responsible for all maintenance and upkeep of the equipment. Additionally, should any equipment need to be replaced, LMC is responsible for procurement and purchase of new equipment. Replacement equipment provided by LMC at LMC's expense remains the property of LMC.

Standard of Review

A district court has the authority to dismiss an action for lack of subject-matter jurisdiction based on: (1) the complaint alone, (2) the complaint supplemented by undisputed facts, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). The court generally can decide disputed issues of material fact in order to determine whether or not it has jurisdiction. *Montez v. Department of the Navy*, 392 F.3d 147, 149 (3rd Cir. 2004). However, in the context of an FTCA action, the court should not resolve disputed issues that are dispositive of both subject-matter jurisdiction and the merits of the FTCA claim.

Analysis

As a general rule, the United States enjoys sovereign immunity from suit unless it has specifically waived immunity. *See Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). The FTCA provides a limited waiver of sovereign immunity from suit for those claims regarding "injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). Courts must strictly construe waivers of the government's sovereign immunity, and must resolve all ambiguities in favor of the sovereign. *Lane v. Pena*, 518 U.S. 187, 192 (1996); *Chapa v. United States Department of Justice*, 339 F.3d 388, 390 (5th Cir. 2003).

The government is not liable under the FTCA for actions taken by independent contractors or their employees. *United States v. Orleans*, 425 U.S. 807, 813-14 (1976); *Broussard v. United States*, 989 F.2d 171, 174 (5th Cir. 1993). The critical factor in determining whether an individual is an employee of the government or an independent contractor is the power of the government to control the detailed physical performance of the individual. *Linkous v. United States*, 142 F.3d 271, 275 (5th Cir. 1998).

However, while control of the detailed physical performance may be the most critical factor in identifying whether an individual is an employee, it is not necessarily the only factor. *Broussard*, 989 F.2d at 175. If control were the only factor, no professional who exercised professional judgment could be an employee under the FTCA. *Id*. The following additional factors, drawn from the Restatement (Second) of Agency § 220, may be considered: (1) the extent of control which, by the agreement, the master may exercise over the details of the work; (2) whether or not the one employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person

doing the work; (6) the length of time for which the person is employed; (7) the method of payment, whether by the time or by the job; (8) whether or not the work is part of the regular business of the employer; (9) whether or not the parties believe they are creating the relation of master and servant and (10) whether the principal is or is not in business. *Linkous*, 142 F.3d at 276.

Ms. Payne's declaration demonstrates that the most critical factor here–whether the BOP had the power to control the detailed performance of LMC or Ms. Whittington or Ms. Sonier–weighs strongly in favor of the defendant. The contract did not permit such control.

With respect to the remaining factors, the first factor weighs in favor of the defendant as the BOP had no control over the details of the work performed pursuant to the contract. The second factor also weighs in favor of the defendant. LMC and Ms. Wittington and Ms. Sonier were engaged in providing health care, a distinct occupation.

With respect to the third factor, there is no evidence in the record concerning whether the work performed under the contract was usually done under the direction of the employer or by a specialist without supervision. The fourth factor weighs in favor of the defendant as the work being performed required skill in a particular occupation.

The fifth factor weighs in favor of the plaintiff. BOP supplied the place where the work was performed and the initial instrumentalities and tools used to perform the work. With respect to the sixth factor, while the contract between BOP and LMC could be renewed for several years, it is not clear how long the employee relationship was between LMC and Ms. Whittington and Ms. Sonier. It is similarly difficult to determine which party the seventh factor favors.

With respect to the eighth factor, the work performed by LMC and Ms. Whittington and Ms. Sonier was not a part of the principal regular business of the BOP. The ninth factor weighs in favor of the government as the parties to the contact did not believe they were creating the relation of master and servant. Instead, the contract provided that LMC and its employees were to be independent contractors. Finally, tenth factor weighs in favor of he defendant as the BOP is not in business.

In this case, the critical factor weighs strongly in favor the defendant. Moreover, six of the additional factors weigh in favor of the defendant. As a result, it must be concluded that the acts and omissions complained of in this lawsuit were performed by an independent contractor. As the FTCA's waiver of sovereign immunity does not extend to acts and omissions of independent contractors, the court lacks subject-matter jurisdiction over plaintiff's claim. The motion to dismiss is therefore meritorious.

## ORDER

For the reasons set forth above, the defendant's motion to dismiss is **GRANTED**. A final judgment shall be entered dismissing this lawsuit for lack of subject-matter jurisdiction.

**SIGNED** this the **20** day of **March, 2020.**

_____
Thad Heartfield
United States District Judge